UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MONIQUE M. GRANT, ) | CASE NO. 1:12CV1159 |
| ) | |
| Plaintiff, ) | JUDGE LESLEY WELLS |
| v. ) | Magistrate Judge George J. Limbert |
| ) | |
| CAROLYN COLVIN[1], ) | **REPORT AND RECOMMENDATION** |
| ACTING COMMISSIONER OF ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

Monique M. Grant ("Plaintiff") seeks judicial review of the final decision of Carolyn Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court reverse the Commissioner's decision and remand this case to the Administrative Law Judge ("ALJ"):

I. **PROCEDURAL AND FACTUAL HISTORY**

On January 22, 2009, Plaintiff filed an application for DIB, alleging disability beginning on October 18, 2007 due to chronic pericarditis and interstitial pulmonary fibrosis. ECF Dkt. #10 at 129, 149. The SSA denied Plaintiff's applications initially and on reconsideration. *Id*. at 67-78. Plaintiff filed a request for an administrative hearing and on March 1, 2011, an ALJ conducted an administrative hearing. *Id*. at 33, 79-80. At the hearing, the ALJ heard testimony from Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id*. at 33.

On March 9, 2011, the ALJ issued a decision denying benefits. ECF Dkt. #10 at 14-26. Plaintiff filed a request for review of the decision, but the Appeals Council denied the request. *Id*. at 1-9, 257-259.

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

On May 10, 2012, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On October 15, 2012, Plaintiff filed a brief on the merits. ECF Dkt. #13. On December 6, 2012, Defendant filed a brief on the merits. ECF Dkt. #15. On January 2, 2013, Plaintiff filed a reply brief. ECF Dkt. #18.

## II.    RELEVANT MEDICAL HISTORY

On October 18, 2007, Plaintiff presented to the emergency room complaining of shortness of breath and asthma attacks for the past week. ECF Dkt. #10 at 269. She indicated that it felt like she could not complete a deep breath. *Id*. She related that a railroad accident had occurred near her workplace and she was exposed to a significant amount of smoke. *Id*. at 299. Clinical impressions included acute asthma exacerbation and acute dypsnea. *Id*. at 270. While a chest x-ray showed poor inspiratory effort which limited the evaluation, a left lower infiltrate was noted. *Id.* at 277. Plaintiff was treated and discharged with medications. *Id*. at 279.

On October 19, 2007, Plaintiff again presented to the emergency room complaining of shortness of breath and an asthma attack. ECF Dkt. #10 at 287. She was treated and discharged with medication for asthma. *Id.* at 295.

On October 20, 2007, Plaintiff again presented to the emergency room complaining that her symptoms had worsened and she was admitted until November 2, 2007 due to a bad cough, asthma, and shortness of breath. ECF Dkt. #10 at 299. Upon examination, she was fatigued and distressed, but not in respiratory distress. *Id.* at 300. It was observed that she was obese. *Id.* She had very poor air entry, but no wheezing or crackles were heard. *Id*. at 309. Plaintiff reported that she was extremely fatigued, her asthma symptoms had increased significantly, and she was having bouts of coughing. *Id*. at 308. Plaintiff was assessed as having left lower lobe pneumonia with a history of asthma, smoke exposure, and inhalation, and obesity and fatigue. *Id*.

Dr. Wolf examined Plaintiff in the hospital for her complaints of shortness of breath. ECF Dkt. #10 at 310. He noted that Plaintiff was about to be discharged when she complained that when she had any abdominal pressure, she became short of breath, even when she felt abdominal pressure from eating or if her bladder was full. *Id.* Dr. Ashraf's impression was that Plaintiff's symptoms were not gastrointestinal but pulmonary in nature. *Id*. at 311. A chest x-ray showed that Plaintiff

had early bronchiectasis in the lower zones and early interstitial lung abnormalities. *Id*. at 312.

On October 22, 2007, Dr. Gerblich, a pulmonary specialist, performed a consultation concerning the left lower lobe infiltrate in Plaintiff's lung that did not improve with treatment. *Id.* at 314. Plaintiff was complaining of a pleuritic component to her cough that continued. *Id.* Upon examination, Dr. Gerblich noted rales and crackles in the left base of Plaintiff's lung, but no wheezes were heard and the crackles improved and disappeared after several vital capacity maneuvers. *Id.* He diagnosed asthma and also indicated that he would explore whether any other pulmonary process was a factor upon reviewing her pulmonary function tests. *Id*. Dr. Gerblich noted that he had spoken to a government official regarding exposure to harmful gases or toxins that had occurred from the train derailment and fire that was .8 miles away from where Plaintiff was working, but the official indicated that nitrous oxide, sulfur oxide and other particulates half a mile away from the site were very low. *Id*. Dr. Gerblich interpreted the pulmonary function test results as showing that Plaintiff had moderate restrictive ventilatory defect. *Id*. at 322.

On October 29, 2007, Dr. Gerblich performed a bronchoscopy and the results came back as negative for malignancy. ECF Dkt. #10 at 318-319.

On October 30, 2007, Dr. Dickman was consulted regarding cold agglutinins detected in Plaintiff's blood. ECF Dkt. #10 at 316. A chest x-ray with high resolution showed additional findings consisting of areas of interstitial pneumonitis as well as possible areas of bronchiectasis. *Id.* He found no evidence of pulmonary lymphadenopathy. *Id*. Dr. Dickman found the medical evidence to be most consistent in terms of acute onset with acute infectious process either viral or myeoplasma. *Id*. He ordered additional testing. *Id.*

On November 14, 2007, Dr. Favorite performed a consultation and upper endoscopy to evaluate whether a gastrointestinal component existed to Plaintiff's complaints of midsternal chest pain. ECF Dkt. #10 at 329. Dr. Favorite noted that Plaintiff had undergone a cardiac catherization earlier that morning which showed a small pericardial effusion and the plan was to treat her for pericarditis. *Id*. at 329, 342. Her impressions were that Plaintiff had chest pain secondary to pericarditis. *Id*. at 330. The endoscopy revealed that Plaintiff had unspecified gastritis and gastroduodenitis. *Id*. at 338.

Chest x-rays on November 14, 2007 showed no lymphadenopathy, but interstitial markings were noted in the posterior right and left lung bases, as well as some pleural thickening. ECF Dkt. #10 at 335.

On January 3, 2008, Plaintiff was sent for an infectious disease consultation with Dr. Duin at the Cleveland Clinic for her pulmonary fibrosis. ECF Dkt. #10 at 389. Plaintiff reported that she had not used her asthma medications for one year until October 12, 2007 when she started to experience shortness of breath and chest pain. *Id*. Dr. Duin noted that Plaintiff had presented to the emergency room on three different occasions during a short period of time and she was sent home with nebulizers and medications, but they did not help. *Id*. Upon examination, Dr. Duin noted bilateral crackles at the bases of Plaintiff's lungs and he reviewed the CT scans of the chest which showed unchanged predominantly peripheral patchy areas of interstitial lung disease with segmental and subsegmental volume loss with early associated bronchiectasis, mostly in the lower zones, and mild early interstitial lung abnormalities. *Id.* at 391. Dr. Duin's impression was that Plaintiff had interstitial lung disease of an unclear etiology with persistent symptoms. *Id*. He doubted that an infectious cause existed based upon the testing and history. *Id.*

On January 11, 2008, Plaintiff presented to the emergency room complaining of chest pain and shortness of breath. ECF Dkt. #10 at 344-345. On January 12, 2008, Dr. Gerblich examined Plaintiff at the hospital, noting that while her asthma was well-controlled with medication, she still complained of shortness of breath and chest discomfort. *Id*. at 352. He noted that repeat pulmonary function tests showed a restrictive defect that was not improving and in fact was declining. *Id.* He further noted that a CT scan showed interstitial lung changes in the lower left lobe with no significant progression. *Id*. He indicated that Plaintiff's coxsackie level was 1080, her epstein-barr viral and IgG were mildly elevated, as well as her lympocytes and neutrophils, and her alveolar macrophages were significantly depleted and her CRPA level was high. *Id*. Dr. Gerblich's impression was interstitial lung disease and he recommended an open lung biopsy to which Plaintiff agreed. *Id*. at 353. The lung biopsy revealed interstitial fibrosis with patchy acute and early organizing pneumonia. *Id*. at 356. On January 18, 2008, Plaintiff was discharged from the hospital *Id.* at 675.

-4-

On February 14, 2008, Plaintiff's primary care physician, Dr. Vizy, referred her to Dr. Liu for a second opinion with regard to her interstitial lung disease. ECF Dkt. #10 at 374. Upon examination, Dr. Liu noted bilateral crackles in Plaintiff's lungs, mild finger clubbing, and a pulse oximetry reading of 96% on room air. *Id.* Dr. Liu discussed the etiology of the lung disease with Plaintiff and it was his opinion that the train derailment fire did not cause her disease because it appeared that the pattern of the disease had already been detected in October of 2007 when the fire occurred. *Id.* at 375. He ordered a CT scan. *Id.*

Dr. Liu again met with Plaintiff on March 31, 2008 and indicated that the CT scan showed a predominant peripheral scattered interstitial process more prominent on the left than the right and more prominent in the lower lung zones. ECF Dkt. #10 at 376. Upon examination, Dr. Liu noted bilateral basilar crackles in the lungs, finger clubbing, and a pulse oximetry reading of 98% on room air at rest and then 92% after ambulating for four minutes. *Id.*

An April 22, 2008 chest CT showed mainly unchanged scattered interstitial lung disease, except for a more pronounced subsegmental left upper lobe alveolar infiltrates compared to prior examinations. ECF Dkt. #10 at 378. A lateral chest x-ray showed cardiomegaly and some lung scarring, but no significant change from the prior chest scans. *Id.* at 381.

On July 24, 2008, Plaintiff was evaluated for a pulmonary embolism due to her complaints of shortness of breath and anterior chest pain. ECF Dkt. #10 at 498. Test results showed a low probability for pulmonary embolism, but showed mild cardiomegaly, left lower lobe atelectasis and questionable minimal right lower lung atelectasis. *Id.*

Dr. Gerblich sent Plaintiff to the Cleveland Clinic for consultation for a lung transplant evaluation. ECF Dkt. #10 at 395. Dr. Chapman examined Plaintiff, reviewed her medical history, and noted that the pathology showed a small airway remodeling and bronchiolectasis with scattered areas of organizing pneumonia. *Id.* at 409. He indicated that the differential diagnosis was most likely chronic hypersensitivity pneumonitis from a remote exposure, usual interstitial pneumonitis, or connective tissue disease. *Id.* His plan was to taper Plaintiff's prednisone dose, which had caused her to gain weight, to stop the methotrexate that she was taking, to enroll her in pulmonary rehabilitation, and to follow up in three months in order to determine if she was progressing and

-5-

losing weight so that the lung transplant evaluation could take place.  *Id*.

Pulmonary function testing on October 20, 2008 showed moderately severe restriction and moderately reduced DLCO.  ECF Dkt. #10 at 412.

Plaintiff was admitted to the hospital on October 23, 2008 for chest pain and discharged on October 26, 2008 with diagnoses including idiopathic fibrosis, alveolitis, chest pain, asthma, nausea, and morbid obesity.  ECF Dkt. #10 at 503.  She received numerous treatments, including medications, physical therapy, respiratory therapy, and DVT prophylaxis.  *Id*. at 505.

On November 7, 2008, Plaintiff was admitted to the hospital and not discharged until November 12, 2008.  ECF Dkt. #10 at 554, 663.  On November 10, 2008, Dr. Gerblich examined Plaintiff while she was in the hospital due to symptoms of nausea and vomiting with a fever.  *Id*. at 570.  Dr. Gerblich noted that Plaintiff was well-known to him based upon previous admissions for interstitial lung disease that was biopsied and found to be interstitial pneumonitis.  *Id*.  He further noted that Plaintiff was on high doses of prednisone without successful resolution of the aggression of her illness and he had sent her to a clinic to get on a lung transplant list.  *Id*.  He indicated that she was currently in a rehabilitation program trying to reduce her body weight so that she could qualify for a lung transplant.  *Id*.  Testing for the current symptoms showed that Plaintiff had no ulcer disease, but had some bile in her stomach.  *Id*.  Dr. Gerblich's examination showed that Plaintiff had fine crackles in her chest, but no wheeze,  *Id*.  He also noted that a chest x-ray showed that the lung infiltrate was borderline cardiomegaly.  *Id*.  He diagnosed Plaintiff with nausea and vomiting, secondary to narcotics and analgesic injections, and interstitial lung disease with possible exenteration.  *Id.* at 570-571.  In light of the louder interstitial cracklings, he ordered a CT scan without contrast to see the extent of Plaintiff's disease and a pulmonary function test to follow lung volume and VLCO change.  *Id*.  On November 11, 2008, the pulmonary function test revealed a severe obstructive ventilatory defect with decreased diffusing capacity and a decline in lung function since the previous study.  *Id*. at 585.  On November 12, 2008, Plaintiff was discharged from the hospital with diagnoses of gastroparesis, viral enteritis, benign neoplasm of the stomach, adverse effects of sedatives, long-term use of medications, hypertension, chronic respiratory complications, asthma, obesity history of peptic ulcer, dehydration and chronic pain.  *Id.* at 663.

Plaintiff participated in pain management, including nerve blocks and medications, throughout 2008 and 2009 due to her post thoracotomy pain on the right chest wall. ECF Dkt. #10 at 456-481. She reported that her sharp, stabbing, continuous chest pain became worse when standing, walking, and lifting. *Id*. She was diagnosed with myofascial pain post laminectomy and post thoracotomy pain. *Id*.

On April 14, 2009, agency reviewing physician Dr. Neiger provided a physical RFC assessment for Plaintiff's primary diagnosis of interstitial lung disease and secondary diagnosis of obesity. ECF Dkt. #10 at 744. Dr. Neiger opined that Plaintiff could occasionally lift and carry up to twenty pounds occasionally and up to ten pounds frequently, she could sit up to six hours per eight-hour workday, stand and/or walk up to four hours per eight-hour workday, and she had the unlimited ability to push and pull. *Id*. at 745. In explaining her findings, Dr. Neiger noted no rales, rhonchi, wheezing on examinations by doctors, as well as no chronic atelectasis and no apraxia on examinations. *Id.* She also noted normal neurological examinations. *Id*. at 746. Dr. Neiger opined that Plaintiff could occasionally climb ramps and stairs, and could occasionally stoop, crouch and crawl, but she could never climb ladders, ropes or scaffolds. *Id*. She further opined that Plaintiff had to avoid even moderate exposure to extreme cold and fumes, odors, dusts, gases and poor ventilation. *Id*. at 748.

On May 2, 2009, Plaintiff was admitted to the hospital based upon complaints of shortness of breath and chest pain. ECF Dkt. #10 at 755. She was discharged on May 12, 2009 with diagnoses of postinflammatory pulmonary fibrosis, acidosis, chronic obstructive asthma, hypokalemia, BMLI 40 and over, painful respirations, abdominal pain, obesity, vitamin D deficiency, leukocytosis, adverse effects of corticosteroids, and acquired absence of cervix and uterus. *Id.* She underwent various tests and treatments, including desaturation study and CT of the chest, pulmonary function testing, physical therapy, respiratory therapy, DVT prophylaxis and pain management. *Id.* at 756. Dr. Gerblich performed a consultation on May 4, 2009 and indicated that during her prior admissions, Plaintiff was diagnosed with interstitial pneumonitis and had been on high dose steroids, but had been off of medication as of late and her lung volume and CT scan showed stabilization. *Id.* at 766. He noted that Plaintiff was admitted for chest pain and shortness of breath and he sought

to rule out exacerbation of her lung disease. *Id.* A May 4, 2009 chest CT scan showed an enlarged heart and lung scarring, but no significant changes from previous CT scans. ECF Dkt. #10 at 784.

A July 20, 2009 pulmonary function test ordered by Dr. Gerblich showed a severe restrictive ventilatory defect. ECF Dkt. #10 at 902. On July 27, 2009, pulmonary function tests ordered by Dr. Gerblich showed that Plaintiff had a severe restrictive ventilatory defect. ECF Dkt. #10 at 899.

On September 30, 2009, agency reviewing physician Dr. Freihofner affirmed Dr. Neiger's RFC based upon the following:

> Although there appears to be some worsening on the 2009 pulmonary testing the tests are invalid for the most part. I note that claimant's six minute walk test show excellent oxygen saturations and that resting ABGs are normal.

ECF Dkt. #10 at 904.

Dr. Gerblich examined Plaintiff on July 12, 2010 again for her complaints of chest pain and a reported worsening sensation of shortness of breath. ECF Dkt. #10 at 1130. He found that Plaintiff had crackles in her left lower lobe and a chest x-ray showed possible left pleural infiltrate. *Id.* at 1132. He questioned whether Plaintiff was having an exacerbation of her interstitial lung disease and ordered a high resolution CT scan to better visualize the lower left lobe. *Id.*

On January 26, 2011[2], Dr. Gerblich completed an attending physician statement for Plaintiff who was seeking disability benefits from an insurance company through her employer. ECF Dkt. #10 at 1126. He indicated that he first started treating Plaintiff on December 5, 2007 and last treated her on January 17, 2011 and advised her to cease working at her occupation. *Id.* He listed her diagnoses as interstitial pulmonary fibrosis and morbid obesity and described her symptoms as shortness of breath. *Id.* As to objective findings supporting his diagnosis, Dr. Gerblich indicated that pulmonary function tests showed that Plaintiff had severe obstructive ventilatory defect and moderately severely restrictive DLCO. *Id.* He listed all of Plaintiff's medications and opined that Plaintiff could sit for up to two hours continuously, stand for up to one hour continuously, and walk for zero hours continuously. *Id.* at 1127. He further opined that Plaintiff could climb, but she could

---

[2] Although the ALJ and the parties refer to this assessment as dated January 16, 2011, it appears that the statement is dated January 26, 2011. Moreover, this makes sense since Dr. Gerblich indicated in the statement that his most recent treatment of Plaintiff was January 17, 2011. ECF Dkt. #10 at 1126.

not twist/bend/stoop, reach above shoulder level, or operate a motor vehicle. *Id*. He found that Plaintiff could never lift and carry even up to ten pounds, but she could perform fine finger movements, eye and hand movements and push and pull in a repetitive motion. *Id*. He also opined that Plaintiff could engage in only limited stress situations and interpersonal relations. *Id*.

Plaintiff began treating with her primary care physician Dr. Vizy in 2001 and followed up with her for all of her impairments. ECF Dkt. #10 at 627-661. Dr. Vizy completed a medical source statement on February 2, 2011 indicating that she saw Plaintiff once every three months and on an as-needed basis. *Id*. at 1036. She listed Plaintiff's diagnoses as post-inflammatory pulmonary fibrosis, hypothyroidism, sleep apnea, depression and asthma. *Id*. Her prognosis for Plaintiff was poor and she concluded that Plaintiff's impairments lasted or could be expected to last for at least twelve months. *Id*. She identified Plaintiff's symptoms as shortness of breath and depression and she noted that Plaintiff was not a malingerer. *Id*. She opined that changing weather, coldness, fatigue, and activity precipitated or worsened Plaintiff's pain and her impairments were reasonably consistent with the symptoms and limitations that Dr. Vizy had described in the instant evaluation. *Id*. at 1037. Dr. Vizy concluded that Plaintiff's pain or symptoms would be severe enough to interfere with her attention and/or concentration to perform even simple tasks frequently, which was defined as 34% to 66% of an eight-hour working day. *Id*. Dr. Vizy further opined that Plaintiff could stand or walk up to thirty-minutes at a time for up to two hours of an eight-hour workday; sit for up to one hour at a time for up to four total hours per eight-hour workday; occasionally lift less than ten pounds, rarely lift ten pounds, and never lift twenty or fifty pounds; occasionally twist; rarely stoop, crouch/squat, bend or climb stairs; occasionally look downward; frequently turn her head right or left, look up or hold her head in a static position; and only occasionally reach overhead. *Id*. at 1038-1039. She also opined that Plaintiff needed a job that permits shifting positions at will from sitting, standing, or walking and she would sometimes need to take unscheduled breaks during the workday. *Id.* One of the questions on the statement form asked whether Plaintiff's impairments were likely to produce "good days" and "bad days." *Id*. at 1040. Dr. Vizy scratched out "good days," kept "bad days," and added "worse day[]" and answered "yes." *Id*. Dr. Vizy also affirmed that Plaintiff's impairments had existed and persisted with the restrictions that she described in the

-9-

statement since October of 2007. *Id.*

### III.  SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

In his decision, the ALJ determined that Plaintiff suffered from interstitial lung disease, asthma, obstructive sleep apnea, undifferentiated connective tissue disease, status-post thoracotomy, hypothyroidism, obesity, hypertension, pericarditis, thoracic and lumbar degenerative disc disease, left hip osteoarthritis, depression, and anxiety, which qualified as severe impairments under 20 C.F.R. §404.1521 *et seq.* ECF Dkt. #10 at 16. The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *Id.* He discounted Plaintiff's allegations of pain and concluded that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with the following limitations: occasional climbing of ramps and stairs and occasional balancing, stooping, kneeling, crouching, and crawling; never climbing ladders, rope, or scaffolds; avoiding concentrated exposure to extreme heat and cold and hazards such an unprotected heights and dangerous machinery; avoiding even moderate exposure to pulmonary irritants such as fumes, dust, odors, gases and poorly ventilated areas; simple, repetitive work in a low-stress environment with no strict production quotas; only occasional interaction with the public, co-workers, and supervisors. and no working around hazards. *Id.* at 18-19.

Based upon this RFC and the testimony of the VE, the ALJ found that Plaintiff could not return to her past relevant work, but she could perform jobs existing in significant numbers in the national economy, including the representative occupations of a final assembler of optical goods, order clerk, or a charge account clerk. ECF Dkt. #10 at 25.

### IV.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

> 3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));
>
> 4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));
>
> 5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011), quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported

-11-

an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## VI.    ANALYSIS
### A.    TREATING PHYSICIAN RULE

Plaintiff first asserts that the ALJ failed to follow the treating physician rule in addressing the opinions of her treating physicians, Dr. Gerblich and Dr. Vizy. ECF Dkt. #13 at 13-16. The undersigned recommends that the Court find merit to Plaintiff's assertion.

In a section of his decision entitled "Opinions," the ALJ reviewed the various opinions of Plaintiff's treating, examining and reviewing physicians. ECF Dkt. #10 at 22-24. As to Dr. Gerblich, the ALJ noted that he was Plaintiff's treating physician who provided his assessment on January 16, 2011[3]. *Id.* at 23. The ALJ noted that Dr. Gerblich had opined that Plaintiff could: continuously sit for 2 hours; stand for 1 hour; walk for zero hours; climb; never twist, bend, stoop, reach above shoulder level, or operate a motor vehicle; and could engage in only limited stress situations with limited interpersonal relationships. *Id.* In affording this opinion only "little weight," the ALJ stated that the evidence did not support such strict limitations with stooping, lifting and carrying because Plaintiff's physical examinations yielded mostly normal results. *Id.* at 23-24.

As to Dr. Vizy, the ALJ reviewed her February 2, 2011 assessment that Plaintiff could: stand and walk up to thirty minutes at a time for up to two hours per day; sit for one hour at a time for up to four hours per day; shift positions at will; take unscheduled breaks; occasionally lift and carry less than ten pounds; rarely lift and carry ten pounds; never lift or carry over twenty pounds; only occasionally twist; rarely stoop, crouch, squat, bend or climb stairs; occasionally look down or reach overhead; and she would miss more than four days of work per month because of her impairments or treatments. ECF Dkt. #10 at 24. The ALJ afforded this opinion only "modest weight, but only to the extent that it is consistent with the record as a whole." *Id.* He concluded that while Dr. Vizy's opinion supported a RFC limiting Plaintiff to sedentary work:

---

[3]    Again, although the ALJ and the parties refer to this assessment as dated January 16, 2011, the statement is actually dated January 26, 2011. ECF Dkt. #10 at 1126.

> some of her restrictions, like the claimant only being able to sit for 4 hours a day, appear excessive. The objective evidence of record does not support limitations with regards to the claimant's ability to sit. Similarly, the limitations Dr. Vizy places on the claimant with regard to her postural functioning, reaching overhead, and bending her neck are not supported by the claimant's largely normal radiological studies and neurological and muskuloskeletal signs. Finally, the undersigned notes that Dr. Vizy's findings with regard to the claimant's missing 4 days a month from work are not shared by any of the other medical sources.

*Id.*

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. An ALJ must give controlling weight to the opinion of a treating physician if the ALJ finds that the opinion on the nature and severity of an impairment is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). If an ALJ does not give controlling weight to the opinions of a treating physician, the ALJ must apply the factors in 20 C.F.R. § 404.527(d)(2)(i), (d)(2)(ii), (d)(3) through (d)(6) [20 C.F.R. §416.927(d)(2)(i), (d)(2)(ii), (d)(3) through (d)(6) for SSI] which include the length of the treatment relationship, the frequency of the examinations, the nature and extent of the treatment relationship, the supportability of the opinions with medical signs, laboratory findings, and detailed explanations, consistency of the opinions with the record as a whole, the specialty of the treating physician, and other factors such as the physician's understanding of social security disability programs, and familiarity of the physician with other information in the claimant's case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore " 'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.' " *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004), quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2nd Cir.1999). Further, it

-13-

"ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007), citing *Wilson*, 378 F.3d at 544.

The ALJ and Defendant acknowledge that Dr. Gerblich and Dr. Vizy are treating physicians. ECF Dkt. #10 at 23-24. Dr. Gerblich is Plaintiff's treating pulmonary specialist and Dr. Vizy is Plaintiff's treating primary care physician.

The undersigned recommends that the Court find that the ALJ in this case failed to comply with the treating physician rule as to the opinions of Dr. Gerblich and Dr. Vizy. Dr. Gerblich diagnosed Plaintiff with interstitial pulmonary fibrosis and morbid obesity and described her symptoms as shortness of breath. ECF Dkt. #10 at 1126. The ALJ afforded his opinion only "little weight," stating that the evidence failed to support the strict limitations of stooping, lifting and carrying because of the mostly normal neurological and musculoskeletal examinations. *Id*. at 24. As to Dr. Vizy's opinion, she diagnosed Plaintiff with post-inflammatory pulmonary fibrosis, hypothyroidism, sleep apnea, depression and asthma. *Id*. at 1036. The ALJ afforded this opinion only "modest weight," finding that Dr. Vizy's sitting limitation, as well as her postural limitations such as reaching overhead and bending her neck, were not supported by the largely normal radiological studies and neurological and musculoskeletal signs. *Id*. at 24. He also rejected Dr. Vizy's opinion that Plaintiff would be absent four days per month or more from a job due to her impairments because this opinion was not shared by any other medical source. *Id*.

The undersigned recommends that the Court find that the reasons articulated by the ALJ fail to sufficiently articulate his reasons for attributing less than controlling weight to Dr. Gerblich and Dr. Vizy's opinions. He merely generically cited to evidence of "mostly" or "largely" normal neurological and musculoskeletal examinations and radiological examinations, but he did not address whether the limitations of Dr. Gerblich and Vizy were based upon the consistently abnormal pulmonary findings found by Dr. Gerblich and other specialists on examination, chest CT scans, and

pulmonary function tests. Further, the ALJ failed to show that he reviewed and considered the requisite factors of 20 C.F.R. § 404.1527(d), including the length of the treatment relationship between Plaintiff and Drs. Gerblich and Vizy, the nature and extent of their relationship, the supportability of their opinions, and Dr. Gerblich's specialization as a pulmonologist, in deciding to give their opinions less than controlling weight. *See Wilson*, 378 F.3d at 544. He also failed to explain why Dr. Gerblich and Dr. Vizy's opinions, even if not entitled to controlling weight, were not entitled to great deference. Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference." *Rogers*, 486 F.3d at 242.

In *Wilson*, the Sixth Circuit held that the good reasons requirement of the treating physician rule is an important procedural safeguard for claimants. However, the *Wilson* Court left open the possibility that a de minimis violation of the good reasons requirement may constitute harmless error, such as where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." 378 F.3d at 547. The *Wilson* Court noted that harmless error may also be found if "the Commissioner has met the goal of § 1527(d)(2)– the provision of the procedural safeguard of reasons— even though she has not complied with the terms of the regulation." *Id.* In this case, the undersigned recommends that the Court find that the opinions of Dr. Gerblich and Dr. Vizy are not so patently deficient that they could not be credited. The undersigned further recommends that the Court find that the goal behind the treating physician rule has not otherwise been met despite the ALJ's failure to comply with the regulation.

### B. **OBESITY IMPAIRMENT**

Plaintiff also contends that the ALJ failed to consider the effects of her obesity on her other impairments and failed to fully consider the disabling nature of all of her impairments in combination. ECF Dkt. #13 at 16. The undersigned recommends that the Court find no merit to this assertion.

SSR 02-1p provides guidance as to evaluating obesity in disability claims. SSR 02-1p, 2002 WL 34686281. It explains that while a specific Listing for obesity has been eliminated, paragraphs were added to the prefaces of particular Listings in order to ensure that obesity would still be

-15-

evaluated and addressed. *Id*. at \*1. The Ruling acknowledges that obesity "is a risk factor that increases an individual's chances of developing impairments in most body systems," and "commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems." *Id*. at \*3. The Ruling explains that obesity must therefore be considered at every step in the sequential evaluation process beyond Step One. *Id.*

Here, the ALJ did consider Plaintiff's obesity and the impact of her obesity on her other impairments. He found Plaintiff's obesity to be a severe impairment at Step Two. ECF Dkt. #10 at 21. At Step Three, the ALJ considered Plaintiff's impairments and combination of impairments, but stated that Plaintiff did not have objective findings of the necessary severity to meet or medically equal Listings 1.02, 1.04, 3.02, 3.03, 3.09, 4.02, 9.02, 14.06, 12.04, or 12.06. *Id*. at 22. The ALJ was not required to articulate any further with regard to obesity at this Step. *Young v. Astrue*, No. 2012 WL 2071998, at \*10 (S.D. Ohio, June 8, 2012), unpublished, citing *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 4110412 (6th Cir. 2006) ("Social Security Rule 02-1p does not mandate a particular mode of analysis. It only states obesity, in combination with other impairments, 'may' increase the severity of other limitations. It is a mischaracterization to suggest that Social Security Rule 02-1p offers any particular procedural mode of analysis for obese disability claimants."). The ALJ also impliedly indicated that he had considered Plaintiff's obesity at Step Three as he cited to medical evidence that considered Plaintiff's obesity when he reviewed the Listings he found to be pertinent for analysis. For example, in considering Listings 1.02 and 1.04, major dysfunction of a joint and disorders of the spine, the ALJ cited to the physical RFC assessment provided by agency reviewing physician Dr. Neiger, who evaluated Plaintiff's abilities based upon a primary diagnosis of interstitial lung disease and a secondary diagnosis of obesity. *Id.* at 21, citing to ECF Dkt. #10 at 744. In considering Listing 3.02 for chronic pulmonary insufficiency, he also cited to a pulmonary function test which noted Plaintiff's weight as 306 pounds and her height without shoes at 65 inches. *Id*. at 22, citing ECF Dkt. #10 at 1136.

For these reasons, the undersigned recommends that the Court find that the ALJ did not commit error in failing to consider the impact of Plaintiff's obesity in his determination.

### C. CREDIBILITY DETERMINATION

Plaintiff also asserts that the ALJ erred in his credibility analysis. ECF Dkt. #13 at 3. However, if the Court chooses to accept the undersigned's instant Report and Recommendation, the undersigned recommends that the Court decline to address this issue because the ALJ's review and reevaluation of Dr. Gerblich and Dr. Vizy's opinions may impact his findings as to this issue.

## VII. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court reverse the ALJ's decision and remand the instant case to the ALJ for further proceedings consistent with this Report and Recommendation.

DATE: June 24, 2013            */s/George J. Limbert*
                               GEORGE J. LIMBERT
                               UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).